216 F.3d 236 (2nd Cir. 2000)
 DEBRA CIRAOLO, Plaintiff-Appellee,
v.
CITY OF NEW YORK, POLICE DEPARTMENT OF THE CITY OF NEW YORK, CHRISTIN MORGILLO, Detective, Shield No. 2233, JANE DOES 1-2, Shield Nos. Unknown, and JULIE FONTANELLA, Defendants-Appellants.
 Docket No. 99-7550
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: November 24, 1999
Decided: June 15, 2000
 
 Appeal from a final judgment of the United States District Court for the Southern District of New York (Robert P. Patterson, Jr., Judge) awarding plaintiff-appellee Debra Ciraolo $19,645 in compensatory damages and $5,000,000 in punitive damages in accordance with a jury verdict in Ciraolo's suit against defendants-appellants for, inter alia, conducting an unlawful strip search of her person, in violation of 42 U.S.C. § 1983.
 The award of punitive damages is reversed.
 STEPHEN H. WEINER, New York, NY, for Plaintiff-Appellee.
 JULIAN L. KALKSTEIN, Office of the Corporation Counsel of the City of New York, New York, NY (Michael D. Hess, Corporation Counsel, and Larry A. Sonnenshein, on the brief), for Defendants-Appellants.
 Before: LEVAL, CALABRESI, and KATZMANN, Circuit Judges.
 Judges Calabresi and Katzman file separate concurring opinions.
 CALABRESI, Circuit Judge:
 
 
 1
 After a jury trial in the United States District Court for the Southern District of New York (Robert P. Patterson, Jr., J.), plaintiff-appellee Debra Ciraolo was awarded $19,645 in compensatory damages and $5,000,000 in punitive damages against defendant-appellant the City of New York (the "City"), in her suit under 42 U.S.C. § 1983 for, inter alia, an unlawful strip search of her person. The City now appeals the award of punitive damages, and, for the following reasons, we reverse.
 
 
 2
 * In January 1997, following a complaint by her neighbor, with whom she was apparently having a legal dispute, Debra Ciraolo was arrested for aggravated harassment in the second degree, a misdemeanor. Ciraolo was taken to the police station and then to Central Booking, where she was subjected to a strip and body cavity search by two female Corrections Department employees. Ciraolo was ordered to strip naked and made to bend down and cough while she was visually inspected. After spending the night in jail, she was released on her own recognizance; the charges against her were subsequently dismissed. Ciraolo was traumatized by the entire experience, and particularly by the humiliation of the strip search. Diagnosed with post-traumatic stress disorder, she entered therapy and began taking antidepressants.
 
 
 3
 The search of Ciraolo was not an isolated incident. Rather, it was in accordance with an established City policy of strip-searching all arrestees, including misdemeanants, whether or not there was reasonable suspicion that the arrestee possessed contraband. In July 1996, the City's Correction Department had adopted "guidelines [for] the acceptance of all Police Cases for the Manhattan Court Division," providing that "[a]ll police prisoners received shall be strip search[ed] by the officer assigned to the search post." In October 1996, the Executive Officer of the Manhattan Detention Complex implemented the guidelines by sending a memo to all personnel ordering that, "[e]ffective immediately, all female police prisoners arriving at this facility . . . be strip searched." Accordingly, when Ciraolo was arrested in early 1997, she was strip-searched as a matter of course, despite the conceded lack of any reasonable suspicion for the intrusive and demeaning search.
 
 
 4
 Ciraolo brought suit under § 1983 against the City, the police department, and the individual police officers involved in her arrest and search, claiming that she had been falsely arrested, that the police had employed excessive force during the arrest, and that her strip search violated the Fourth Amendment. She also alleged battery, in violation of state law.
 
 
 5
 The district court found that the City's policy of strip-searching all arrestees regardless of the existence of reasonable suspicion violated the Fourth Amendment, in contravention of the clearly established law of this Circuit that "the Fourth Amendment precludes prison officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband." Weber v. Dell, 804 F.2d 796, 802 (2d Cir. 1986). Because the parties had stipulated to the existence of the City's policy of strip-searching all arrestees, and because there was no evidence that Ciraolo was believed to be concealing contraband, the court instructed the jury that the City was liable for any injuries the jury found to have been proximately caused by the strip search.
 
 
 6
 After soliciting letter briefs from the parties on the issue of punitive damages, the district court concluded that, in this case, punitive damages were available against the City because the strip search was pursuant to an official City policy that was contrary to the settled law of the Circuit. Accordingly, over the City's objection, the court charged the jury that punitive damages could be awarded against the City if they found that the City had acted maliciously or wantonly. In doing so, the court told the jury to consider whether compensatory damages would be adequate to punish the City and to deter future unlawful conduct.
 
 
 7
 The jury found in favor of the defendants on Ciraolo's claims of unlawful arrest, excessive force, and battery. It concluded, however, that the City had acted in wanton disregard of Ciraolo's rights when she was strip-searched, and awarded her $5,000,000 in punitive damages, as well as $19,645 in compensatory damages.
 
 II
 
 8
 On appeal, the City does not contest the district court's holding that the strip-search policy was clearly unconstitutional under this Circuit's decision in Weber. Nor does it challenge the award of compensatory damages to Ciraolo. Rather, it contests only the award of punitive damages, arguing that the award was foreclosed by the Supreme Court's decision in City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981), which held that, ordinarily, municipalities are immune from punitive damages under § 1983. In her turn, Ciraolo argues that Newport, in a footnote, permitted municipalities to be charged punitive damages in cases where "the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights," id. at 267 n.29, and that her case falls within this exception. We are, of course, bound by Newport. And we believe that the only fair reading of that decision, and of the footnote on which Ciraolo relies, mandates a conclusion that punitive damages are not available to her.
 
 
 9
 In Newport, a musical concert promoter, Fact Concerts, Inc., brought suit against the City of Newport, Rhode Island, under § 1983 for a violation of its First Amendment rights. Fact Concerts had entered into a contract with Newport to present a jazz festival. Shortly before the festival, Fact Concerts hired the group Blood, Sweat and Tears to replace an act that had dropped out. See id. at 250. Under the impression that Blood, Sweat and Tears was a "rock" group and that it might attract "a rowdy and undesirable audience," id., Newport tried to prevent the group from performing; eventually, the City Council voted to cancel the contract, a decision reported in the local media, see id. at 250-52. Although Fact Concerts obtained an injunction from a state court allowing the festival to proceed, ticket sales were off substantially due to the adverse publicity. See id. at 252. At trial, Fact Concerts won $200,000 in punitive damages against Newport, as well as other damages against the individual officials. See id. at 253.
 
 
 10
 The Supreme Court reversed the award of punitive damages. See id. at 271. In doing so, the Court applied "a two-part approach" to interpreting § 1983. Id. at 259. It considered, first, the extent of municipal immunity at common law and the legislative history relevant to § 1983, and, second, the policies behind punitive damages and their compatibility with the purpose of § 1983. See id. at 258-59.
 
 
 11
 In its historical inquiry, the Court reviewed nineteenth-century tort cases, and concluded that by 1871, when § 1983 was enacted, "municipal immunity from punitive damages was well established at common law." Id. at 263. Proceeding on the premise that Congress would have been fully aware of this common-law immunity and would have been explicit had it intended to abolish the immunity, the Court turned to the legislative history of § 1983 to see if any such intent could be divined. See id. at 263-64. Because, in fact, there was almost no legislative history surrounding the passage of § 1983 itself, the majority looked to the debate that took place over the proposed Sherman amendment to the Civil Rights Act that included § 1983. The Sherman amendment would have made municipalities liable for compensatory damages for injuries caused by mob violence. See id. at 264. Noting that, as one supporter said on the floor of the House, the amendment was not intended "as a punishment for the county," but as "mutual insurance" to "indemnify the injured party," the Court concluded that "a Congress having no intention of permitting punitive awards against municipalities in the explicit context of the Sherman amendment would [not] have meant to expose municipal bodies to such novel liability sub silentio" (and more broadly) under § 1983. Id. at 265.
 
 
 12
 The Court then turned to the question whether the two major policy arguments for punitive damages - deterrence and retribution - would be advanced by assessing punitive damages against cities. It concluded that punitive damages against cities were not justified by a policy of deterrence because (1) it was unclear that municipal officials would be deterred by the prospect of damages borne by the taxpayers; (2) voters would, nonetheless, be likely to vote wrongdoing officials out of office absent punitive damages, both because they had done wrong and because of the possibility of compensatory damages; (3) punitive damages assessed directly against the offending officials would be a more effective means of deterrence; and (4) punitive damages could "create a serious risk to the financial integrity" of cities. Id. at 270; see id. at 268-70.
 
 
 13
 Nor, the Court opined, was the goal of retribution furthered by punitive damages, since such damages would punish only the innocent taxpayers. "[P]unitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers." Id. at 267. Accordingly, the Court held that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." Id. at 271.
 
 
 14
 The Court did, however, indicate that in some rare cases, the goal of retribution might be furthered by punitive damages against a municipality. In a footnote, the majority mused, "It is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights. Nothing of that kind is presented by this case. Moreover, such an occurrence is sufficiently unlikely that we need not anticipate it here." Id. at 267 n.29.
 
 
 15
 Ciraolo relies on footnote 29 for her claim that punitive damages are warranted in her case. She reads the footnote as creating an "outrageous abuse" exception to the general municipal immunity established by Newport, and contends that the City's strip-search policy is sufficiently outrageous to fall within that exception. We believe that Ciraolo misapprehends footnote 29.
 
 
 16
 Footnote 29 must be read as part of the Court's discussion of the retributive function of punitive damages. As such, it elaborates on the Court's conclusion that it is unjust to punish the taxpayers for tortious conduct by municipal officials, because the taxpayers are not normally directly responsible for that conduct. The footnote suggests that, in the rare case where the taxpayers are directly responsible for an outrageous violation of a plaintiff's constitutional rights, it may well be just for the taxpayers to bear the burden of punitive damages. To the extent that footnote 29 creates an exception to Newport's general rule against punitive damages, therefore, it is not an exception for particularly outrageous abuses, as Ciraolo would have it, but rather an exception for outrageous abuses for which the taxpayers are directly responsible.
 
 
 17
 The footnote does not tell us when, in the Court's judgment, taxpayers could be held to be directly responsible for a municipal policy. Although it could be argued that, to the extent that they are also voters who play a part in choosing municipal officials, taxpayers are always responsible for municipal policies, such responsibility is clearly too indirect to give rise to liability for punitive damages under the logic of Newport. Footnote 29 seems, instead, to contemplate a much more immediate connection between the taxpayers' behavior and the unconstitutional municipal policy, perhaps - for example - as close a link as a referendum in which the taxpayers directly adopted the invalid policy.
 
 
 18
 We are, moreover, aware of no case in which a court of appeals has upheld an award of punitive damages against a municipality premised on footnote 29. Indeed, very few cases have even discussed the footnote, although the First and Fifth Circuits have offered considered analyses of it. See Webster v. City of Houston, 689 F.2d 1220 (5th Cir. 1982), rev'd on other grounds on reh'g, 735 F.2d 838 (5th Cir. 1984) (en banc); Heritage Homes of Attleboro, Inc. v. Seekonk Water Dist., 670 F.2d 1 (1st Cir. 1982). In Heritage Homes, the First Circuit appeared to acknowledge that the footnote might apply in a case where the taxpayers voted in favor of an unconstitutional policy, but nevertheless declined to allow punitive damages where residents of the Seekonk Water District had engaged in "blatantly raci[st] discussions" before voting to exclude from access to water a housing development owned by developers willing to sell houses to black families. Id. at 2. The court reasoned that only a tiny minority of Water District members had actually voted to exclude Heritage Homes, and that "[a]bsent widespread knowledgeable participation by taxpayers . . . to award punitive damages against the Water District would not serve the purposes of punishment or deterrence. . . . The actions of a small claque of voters would burden several thousand non-participants, many of whom presumably were unaware of the entire controversy." Id.
 
 
 19
 In Webster, the Fifth Circuit addressed the potential applicability of footnote 29 in a § 1983 suit brought by the parents of Randy Webster, a seventeen-year-old boy shot and killed by Houston police after a car chase -- while he was unarmed and attempting to surrender. The police had attempted to cover up the shooting by planting a gun in the boy's hand, and it came out at trial that the Houston police had an unwritten custom of carrying "throw-downs," guns or knives to be planted near suspects who had been shot in dubious circumstances. After trial, the jury awarded the Websters, inter alia, $200,000 in punitive damages to be assessed on the city. See Webster, 689 F.2d at 1223. Reversing this award of punitive damages, the court stated:
 
 
 20
 The plight of Randy Webster, however reprehensible, however tragic, does not rise to the level of outrageous conduct to which Justice Blackmun referred [in footnote 29]. . . . [Section 1983 was] enacted in a time of frightening violence, to ensure the most basic constitutional rights of citizens in southern states. If the members of Congress who drafted that Act did not intend to establish a rule of punitive damages, we believe that it would take a far more serious violation than that we confront to ground punitive damages against Houston.
 
 
 21
 Id. at 1229. The Webster majority, in contrast to the First Circuit, thus focused on the outrageousness of the particular conduct at issue, rather than the extent to which taxpayers could be held directly responsible for it.
 
 
 22
 In a powerfully written concurrence, Judge Goldberg disagreed with the majority's interpretation of footnote 29. In his view, "rather than creating an exception, this footnote precludes any exception." Id. at 1231 (Goldberg, J., concurring). He commented that "[i]t might be possible to read footnote 29 as allowing an exception where the electorate of a political unit votes affirmatively in favor of outrageous conduct," although "[e]ven in that situation there would be some difficulty in assessing damages where a minority of the electorate voted against the outrageous conduct." Id. at 1231 n.1. Nevertheless, he took the thrust of the footnote to be essentially a bolstering of Justice Blackmun's argument that allowing punitive damages against a municipality would not further their traditional retributive purpose. See id. at 1231. Although he believed that the Supreme Court's holding in Newport swept too broadly, and was both unwarranted and unwise in a case like Randy Webster's, see id. at 1231-32, he therefore concurred in the judgment.
 
 
 23
 We are inclined, like the First Circuit, to the view that any exception envisioned in footnote 29 must be an exception for cases in which the taxpayers are directly responsible - in their role as voters - for the adoption of an unconstitutional municipal policy, rather than an exception for especially outrageous abuses of constitutional rights. If, for example, a town adopted, by a unanimous vote, a referendum establishing an unconstitutional rule, we can see no reason in the policies discussed in Newport why punitive damages ought not to be awarded.[1] But such a case is not before us today. (And so nothing we here say about the applicability of footnote 29 to a referendum can be binding on any future court presented with the question.) Rather, we are here faced with the much more common situation in which an unconstitutional policy has been adopted by municipal officials without any clear endorsement of the policy by the electorate. In such circumstances, while we emphatically deplore the City's conduct in adopting a policy that this Circuit had earlier clearly held unconstitutional, the taxpayers themselves cannot be held to be responsible for the policy under the reasoning of Newport.
 
 
 24
 The district court, while not relying explicitly on footnote 29, concluded that Newport did not preclude the award of punitive damages to Ciraolo because the Newport cause of action stemmed from one improper action by Newport officials, while in Ciraolo's case the City had adopted a policy contrary to the clearly established law of this Circuit. We sympathize with the district court's desire to allow the jury to award punitive damages in this case. Like it, we are seriously troubled by the City's adoption of a policy we had previously held to be unconstitutional. Nevertheless, we conclude that the district court misread Newport, and that the distinction drawn by the court has little force in this context.
 
 
 25
 Municipal liability under § 1983 occurs, if at all, at the level of policy-making, and cannot be premised on a theory of respondeat superior. See Monell v. Department of Soc. Servs., 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."). As a result, the fact that Ciraolo's strip search occurred because of an established City policy in no way distinguishes her case from other § 1983 cases in which municipal liability is established, and cannot suffice to place this case within the seemingly narrow exception carved out by footnote 29.
 
 
 26
 Accordingly, and despite what might be the salutary effects of punitive damages in a case such as this, we are constrained by the Supreme Court's holding in Newport to reverse the award of punitive damages.[2]
 
 
 27
 * * *
 
 
 28
 The award of punitive damages against the City is REVERSED and the case is REMANDED to the district court for entry of judgment in accordance with this opinion.
 
 
 
 Notes:
 
 
 [1]
 We do not speculate on whether punitive damages would be proper if a substantial minority opposed the unconstitutional rule.
 
 
 [2]
 Because counsel conceded that he was not making an argument that the jury might have undervalued compensatory damages given its belief that it could award punitive damages, we express no opinion on whether, absent such a concession, a new trial on compensatory damages might be appropriate. Cf. Webster, 689 F.2d at 1229-30 (reversing both punitive and compensatory damages and remanding for a new trial on damages where the jury had awarded no compensation for damages sustained by the decedent or for the loss of his companionship to his parents, and noting that "the jury, in awarding punitive damages, [may have erroneously] thought it had covered all bases").
 
 
 CALABRESI, Circuit Judge, concurring:
 
 29
 Although the result the court reaches today is compelled by Supreme Court precedent, I respectfully suggest that the policies behind punitive damages and the purpose of 1983 would be better furthered by a different outcome. I write separately to explain why I believe this to be so. Cf. Abbate v. United States, 359 U.S. 187, 196, 3 L. Ed. 2d 729, 79 S. Ct. 666 (1959) (Brennan, J., concurring in his own majority opinion).
 
 
 30
 * The purpose of 1983 is "not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well." Owen v. City of Independence, 445 U.S. 622, 651, 63 L. Ed. 2d 673, 100 S. Ct. 1398 (1980). Indeed, the Court in Newport recognized that punitive damages serve the dual purpose of deterrence and retribution. See Newport, 453 U.S. 247 at 266-67, 69 L. Ed. 2d 616, 101 S. Ct. 2748. Nevertheless, and as discussed above, the Court concluded that "the deterrence rationale of 1983 does not justify making punitive damages available against municipalities," id. at 268, because (1) it was unclear that municipal officials would be deterred by the prospect of damages borne by the taxpayers; (2) voters would still be likely to vote wrongdoing officials out of office absent punitive damages, both because they had done wrong and because of the possibility of compensatory damages; (3) punitive damages assessed directly against the offending officials would be a more effective means of deterrence; and (4) punitive damages could "create a serious risk to the financial integrity" of cities. Id. at 270; see id. at 268-70.
 
 
 31
 The Court's analysis, however, neglected at least one aspect of the deterrence function of punitive damages - an aspect underscored by this case. Punitive damages can ensure that a wrongdoer bears all the costs of its actions, and is thus appropriately deterred from causing harm, in those categories of cases in which compensatory damages alone result in systematic underassessment of costs, and hence in systematic underdeterrence.
 
 
 32
 It is easy to show why this is so. A rational actor[1] will undertake an activity when the benefits of doing so exceed the costs. In doing so, it will make some sort of formal or informal, spoken or unspoken, cost-benefit analysis, based on the information it possesses, to determine if a particular activity is worth its price. Such an analysis cannot be even roughly accurate unless approximately all the costs of the activity are borne by the actor. When the perceived benefits of an activity accrue to the actor, but some significant part of the costs is borne by others, the cost-benefit analysis will necessarily be distorted. In such a case, the actor will have an incentive to undertake activities whose social costs exceed their social benefits. In other words, the actor will not be adequately deterred from undesirable activities. And society will suffer.[2]
 
 
 33
 One goal of the tort system, therefore, is to ensure that actors bear the costs of their activities. See, e.g., Calabresi, supra note 4. And that is also a goal of 1983, which, as the Supreme Court has noted, was designed to deter constitutional torts by making the tortfeasors liable in damages to their victims. See Newport, 453 U.S. at 258; Owen, 445 U.S. at 651.
 
 
 34
 In some circumstances, compensatory damages alone will be enough to promote an adequate cost-benefit analysis. In other cases, however, compensatory damages will not come close to equaling all the costs properly attributable to the activity. Costs may not be sufficiently reflected in compensatory damages for several reasons, most of which go to the fact that not all injured parties are in fact compensated by the responsible injurer. For example, a victim may not realize that she has been harmed by a particular actor's conduct, or may not be able to identify the person or entity who has injured her. See, e.g., Polinsky & Shavell, supra note 4, at 888. Where the injurer makes active efforts to conceal the harm, this problem is of course exacerbated. Moreover, even if a victim is aware of her injury and is able to identify its cause, she may not bring suit. A person will be unlikely to sue if the costs of doing so - including the time, effort, and stress associated with bringing a lawsuit - outweigh the compensation she can expect to receive. A victim is especially unlikely to sue, therefore, in cases where the probable compensatory damages are relatively low. See id. As a result, a harm that affects many people, but each only to a limited degree, will generally be given inadequate weight if only compensatory damages are assessed.
 
 
 35
 In addition, some victims will not sue even if the damages they could expect to receive would exceed the costs of suing. Victims will differ greatly in their knowledge of and access to the legal process, and those who are relatively poor and unsophisticated, as a practical matter, are frequently unable to bring suit to redress their injuries even if those injuries are grave. A harm that disproportionately affects such victims, therefore, is also particularly likely not to be accurately reflected in compensatory damages.
 
 
 36
 For these and other like reasons, compensatory damages are, in wide categories of cases, an inaccurate measure of the true harm caused by an activity, and, as a result, making an injurer bear only such damages does not provide adequate deterrence against socially harmful acts. In such circumstances, additional damages, assessed in the cases that are brought, may be an appropriate way of making the injurer bear all the costs associated with its activities.
 
 
 37
 This idea is far from new. Many years ago, in an influential article that was in part responsible for his receipt of the Nobel Memorial Prize in economics, Professor Becker pointed out that charging a thief the cost of what he had stolen would not adequately deter theft unless the thief was caught every time. Since thieves will not always be caught, they must be penalized by more than the cost of the items stolen on the occasions on which they are caught. This "multiplier" is essential to render theft unprofitable and properly to deter it. See Becker, supra note 4. More recently, scholars have recognized that punitive damages can serve the same function in tort law. See, e.g., Thomas C. Galligan, Jr., Augmented Awards: The Efficient Evolution of Punitive Damages, 51 La. L. Rev. 3 (1990); Polinsky & Shavell, supra note 4.
 
 
 38
 Professors Polinsky and Shavell, for example, have argued that punitive damages should be assessed whenever a tortfeasor has a significant likelihood of escaping liability, and have even suggested a formula (simpler to state than to apply) for calculating such damages: total damages should equal the amount of loss in a particular case, multiplied by the inverse of the probability that the injurer will be found liable.[3] See id. at 889. Thus, if the injurer causes harm of $ 10,000, but will be found liable only one-fifth of the time, total damages - according to Polinsky and Shavell - should equal $ 50,000 ($ 10,000 in compensatory damages and $ 40,000 in punitive damages). See id. Use of such a multiplier, they argue, will cause damages to equal the total harm caused, forcing the injurer to take into account all the costs of its activity and thus decreasing the likelihood that socially harmful activities will persist.[4] See id.
 
 
 39
 Such a conception of punitive damages, again, is not new, and it has been recognized by courts as well as scholars. Indeed, the Supreme Court, considering punitive damages in a quite different context from that in Newport, acknowledged that in determining such punitive damages, it is proper to consider the extent to which the tortfeasor might otherwise escape liability. See BMW of North America, Inc. v. Gore, 517 U.S. 559, 582, 134 L. Ed. 2d 809, 116 S. Ct. 1589 (1996) (noting that "[a] higher ratio" of punitive to compensatory damages "may . . . be justified in cases in which the injury is hard to detect"); see also id. at 592-94 (Breyer, J., concurring) (suggesting that "punitive damages awards that, as a whole, would take from a wrongdoer the total cost of the harm caused" might constrain potential arbitrariness and "counsel[] more deferential review" by appellate courts). In addition, the Seventh Circuit, in a 1983 suit against an individual defendant, has explicitly endorsed the multiplier function of punitive damages. See Kemezy v. Peters, 79 F.3d 33, 35 (7th Cir. 1996) (Posner, J.) (pointing out that "when a tortious act is concealable, a judgment equal to the harm done by the act will underdeter" because the tortfeasor "will not be confronted by the full social cost of his activity"). Finally, Judge Goldberg, in his concurrence in Webster, offered a powerful critique of Newport's treatment of punitive damages and suggested that deterrence would be furthered by the assessment of punitive damages against municipalities in 1983 actions where the municipal policy at issue is one that tends toward concealment of wrongdoing. See Webster, 689 F.2d 1220 at 1235-38 (Goldberg, J., concurring).
 
 
 40
 Although widely accepted by economists and acknowledged by some courts, the multiplier function of punitive damages has nonetheless been applied haphazardly at best. One reason this is so is that the twin goals of deterrence and retribution are often conflated, rather than recognized as analytically distinct objectives. The term "punitive damages" itself contributes greatly to the confusion. For punitive damages, the term traditionally used for damages beyond what is needed to compensate the individual plaintiff, improperly emphasizes the retributive function of such extracompensatory damages at the expense of their multiplier-deterrent function. It also fails totally to explain the not unusual use of such damages in situations in which the injurer, though liable, was not intentionally or wantonly wrongful.[5] A more appropriate name for extracompensatory damages assessed in order to avoid underdeterrence might be "socially compensatory damages." For, while traditional compensatory damages are assessed to make the individual victim whole, socially compensatory damages are, in a sense, designed to make society whole by seeking to ensure that all of the costs of harmful acts are placed on the liable actor.[6]
 
 
 41
 Indeed, it would not be inappropriate to disaggregate the retributive and deterrent functions of extracompensatory damages altogether and allow separate awards to further the two separate goals. In such a system, socially compensatory damages might be permitted in cases in which all the costs of a defendant's actions were not before the court, whether or not the defendant's conduct was particularly blameworthy.[7] But a separate award of punitive damages would be allowed only in cases where the defendant's conduct was sufficiently reprehensible to deserve punishment apart from whatever assessment was required to compensate the individual victim or society as a whole.[8]
 
 
 42
 The majority in Newport raised the objection that "punitive damages . . . are in effect a windfall to a fully compensated plaintiff." Newport, 453 U.S. 247 at 267, 69 L. Ed. 2d 616, 101 S. Ct. 2748. It is likely that a feeling that such "windfalls" are not warranted - and are distributed arbitrarily among plaintiffs - lies, and properly so, behind much of the current distaste for punitive damages. Of course, socially compensatory damages will have an equivalent deterrent effect on the injurer no matter whom they are paid to. As one commentator put it, "an efficient windfall is still efficient." Galligan, supra, at 58; see also Webster, 689 F.2d at 1237 n.7 (Goldberg, J., concurring). Nevertheless, the existence of such potential windfalls may well induce undesirable behavior on the part of victims and of their lawyers. And there is no good reason why socially compensatory damages should be paid to the individual plaintiff, at least beyond a relatively small part sufficient to induce the victim to undertake the expense of pleading and proving them.
 
 
 43
 In fact, in order to achieve the goal of social compensation, as well as the goal of optimal deterrence, it would be preferable if such damages were paid into a fund that could then be applied to remedy some of the unredressed social harm stemming from the defendant's conduct. And some states have explicitly recognized this socially compensatory function by mandating that at least a portion of punitive damages awards should go not to the plaintiff, but to the state treasury or to a specified fund. See BMW, 517 U.S. at 616-18 (Ginsburg, J., dissenting) (collecting state laws providing for allocation of punitive damages to state agencies). A similar mechanism could be employed in the case of socially compensatory damages assessed against municipalities.[9]
 
 II
 
 44
 As Judge Posner suggested in Kemezy, socially compensatory damages are anything but foreign to the goals of 1983. And the rationale for socially compensatory damages in the case of an individual defendant holds equally true where the defendant is a municipality. Indeed, the case before us shows especially vividly the possible utility of such socially compensatory damages. Here, the City of New York adopted a strip-search policy that it knew or clearly should have known was unconstitutional. Counsel for the City estimated at trial that about 65,000 people arrested for misdemeanors had been subjected to strip searches under the policy. Under ordinary circumstances, very few of those 65,000 victims would have been likely to sue, both because the compensatory damages they would have received would have been relatively low and because they were no doubt, in the main, relatively poor and unsophisticated.
 
 As one scholar has noted:
 
 45
 The conditions of constitutional tort litigation for harm caused by law enforcement officials are ones in which the deterrent effect is likely to be on the low side. The potential plaintiffs, after all, are individuals who are in contact with the criminal justice system, generally as suspects or defendants. Many are unlikely to bring suit for harm suffered, whether because of ignorance of their rights, poverty, fear of police reprisals, or the burdens of incarceration. Moreover, in many cases the harm suffered by individuals from the constitutional violation itself may be small, widely dispersed, and intangible, providing little incentive for potential plaintiffs to sue, especially given the lack of sympathy that this group of plaintiffs can expect from the trier of fact.
 
 
 46
 Daniel J. Meltzer, Deterring Constitutional Violations by Law Enforcement Officials: Plaintiffs and Defendants as Private Attorneys General, 88 Colum. L. Rev. 247, 284 (1988) (footnotes omitted). In such circumstances -- which are epitomized in the case before us -- socially compensatory damages may well be necessary if, consistent with the goals of 1983, constitutional violations are to be deterred adequately.
 
 
 47
 Socially compensatory damages are, of course, not the only possible means of deterrence in such situations. Two other approaches come readily to mind. Neither, however, is likely to suffice to achieve the purposes of 1983.
 
 
 48
 First, one might think that an injunction, and the possibility of contempt sanctions for flouting it, would deter municipalities from engaging in repeated constitutional violations. Standing doctrine, however, generally precludes a 1983 plaintiff from obtaining injunctive relief unless she can demonstrate that she is likely to be subjected to the same conduct in the future, a showing that can be very difficult to make. See City of Los Angeles v. Lyons, 461 U.S. 95, 105-06, 75 L. Ed. 2d 675, 103 S. Ct. 1660 (1983) (holding that a plaintiff injured on one occasion by a police chokehold has no standing to seek an injunction against such chokeholds).
 
 
 49
 Second, it is possible that where many people suffer a relatively small harm, they could bring a class action and obtain damages that would approximate the total harm caused by the constitutional violation. And, in fact, a class action has been brought against the City by the victims of the strip-search policy. See Benjamin Weiser, Strip-Search Case Leaves City Facing a Bigger Liability, N.Y. Times, May 12, 1999, at A1. But class actions have their own limitations. For one thing, there are many situations in which the likelihood of escaping liability stems not from the high number of victims of an unconstitutional wrong, but from the municipal defendant's attempts to conceal that wrong. See Webster, 689 F.2d at 1235-38 (Goldberg, J., concurring). It may be, therefore, that a municipal defendant has a significant chance of escaping liability and yet the number of potential plaintiffs is not great enough to satisfy the numerosity requirement of Rule 23. See Fed. R. Civ. P. 23(a)(1). Moreover, use of the class mechanism can result in compromising plaintiffs' autonomy and ignoring conflicts among class members. Finally, like individual plaintiffs, class-action plaintiffs face costs that might dissuade them from bringing suit, including the added cost of managing the class, and these may well offset the economies of scale achieved through a class action. All in all, there is little reason to think that class actions can, or should, be the sole or even the principal vehicle for dealing with underdeterrence.
 
 
 50
 Once it is recognized that remedying underdeterrence is an appropriate function of extracompensatory damages against a municipality, and that it is a goal that can be separated from punishment, Newport's objections to punitive damages under 1983 lose much of their force. First, the kind of socially compensatory damages I have been discussing would not punish "blameless or unknowing taxpayers," Newport, 453 U.S. at 267, for they would not be punishment at all. Second, if deterrence is viewed not as an incidental byproduct of punishment, but as deriving instead from the placement of the relevant costs of a city policy on the city in order to encourage a more rational decisionmaking process, Newport's arguments that extracompensatory damages would not be likely to deter cities also fall.
 
 
 51
 Thus, the Newport Court contended that it was unclear that municipal officials would be deterred by the prospect of damages borne by the taxpayers. See id. at 268-69. But an analogous argument was long ago refuted with respect to corporations and to not-for-profit institutions.[10] It is no more valid for governmental ones. Assuming that a city is at least minimally rational in its decisionmaking, it will be better able to assess the relative social costs and benefits of a particular municipal policy if it knows that it will bear all, rather than only some, of the costs of that policy. Both a city's power to tax and its officials' ability to stay in office are limited by political considerations, and when taxpayers must pay more and get less in return they - like charitable donors or buyers of goods - will make their displeasure known.
 
 
 52
 Second, the Court argued that voters would be likely to vote wrongdoing officials out of office even absent punitive damages, both because the officials had done wrong and because of the possibility of compensatory damages. See 453 U.S. at 269. But, again, damages that are equal to the harm caused by a particular municipal policy would presumably encourage voters to call their elected representatives to account more often than would damages that by definition represent only a small fraction of that harm.
 
 
 53
 Third, the Court contended that punitive damages assessed directly against the offending officials would be a more effective means of deterrence. See id. at 269-70. But, in the case of a municipal policy for which no one official is primarily responsible, damages premised on individual guilt are unlikely to be efficacious. See Webster, 689 F.2d at 1236-37 (Goldberg, J., concurring) ("At whom do we point the finger of guilt in the case of tragic collective apathy?"). Moreover, the incapacity of individual offending officials to pay significant damage awards inevitably limits such officials' responsiveness to the threat of suits.[11]
 
 
 54
 Fourth, and finally, the Newport majority evinced concern that punitive damages could "create a serious risk to the financial integrity" of cities, in part because "the unlimited taxing power of a municipality may have a prejudicial impact on the jury, in effect encouraging it to impose a sizable award." Newport, 453 U.S. at 270. I am not insensitive to the possibility that a very large award of damages could affect a city's finances. And it is for that very reason - contrary to the Newport Court's first argument - that socially compensatory damages would be likely to prove an effective deterrent. See Webster, 689 F.2d at 1237 (Goldberg, J., concurring) ("It is necessary that the threatened damages cause some deprivation for the populace so that they will be nudged out of their blissful ignorance . . . ."). Nevertheless, I emphasize that, in assessing the kind of damages that I have been discussing (in contrast to traditional punitive damages), it would not be proper for a trier of fact to take the city's taxing power into account. The basis for socially compensatory damages is the multiplier effect, that is, the probability that the city would otherwise escape liability for damages it actually caused, and not the depth of its pockets. And this basis should be strictly enforced by the court in reviewing damage awards.
 
 
 55
 Because the Court in Newport focused on the difficulty with furthering the retributive goals of punitive damages in the case of a municipality, and envisioned deterrence as an ancillary consequence of retribution, it did not examine the possibility that socially compensatory, as opposed to traditional punitive, damages might comport both with Congress's original intent and with the policies behind 1983. As a lower court bound by Newport, it is not for us to decide this question. Nevertheless, I respectfully suggest that the purpose of 1983, to protect federal constitutional rights against infringement by state actors, is not served when - as in the case before us - the prospect of damages awarded pursuant to the statute manifestly fails to deter a municipality from adopting a policy that it clearly knows or should know violates the Fourth Amendment.
 
 
 
 Notes:
 
 
 [1]
 A municipality is unlikely always to act rationally. Nevertheless, it is fair to assume that its behavior will be influenced by the extent to which it is made to bear the costs associated with its behavior. Indeed, 1983, and Newport itself, are premised on that very principle. See Newport, 453 U.S. at 266; Owen, 445 U.S. at 651-52.
 
 
 [2]
 These basic principles of the economic theory of deterrence are widely accepted, and have been applied to both tort and criminal law. See generally, e.g., Gary S. Becker, Crime and Punishment: An Economic Approach, 76 J. Pol. Econ. 169 (1968); see also Guido Calabresi, The Costs of Accidents (1970); A. Mitchell Polinsky & Steven Shavell, Punitive Damages: An Economic Analysis, 111 Harv. L. Rev. 870 (1998).
 
 
 [3]
 The formula is not unique to Professors Polinsky and Shavell. For a very similar analysis, see Robert Cooter & Thomas Ulen, Law and Economics 311-15 (2d ed. 1997). I note that I express no opinion as to the conclusions reached by Professors Polinsky and Shavell regarding the availability of punitive damages in specific cases.
 
 
 [4]
 It is possible that, in some circumstances, use of a multiplier formula might overdeter socially useful conduct. Litigation costs borne by the defendant themselves have a deterrent effect that may not be taken into account by a simple multiplier formula. And, although in a legal system that works efficiently, litigation costs would generally be a part of the social cost attributable to the harm caused by the defendant, unnecessary costs of administering such a system may properly be viewed as beyond the actual harm caused. Where a defendant is forced to bear such excess administrative costs, the multiplier formula might overdeter. Despite such failings, however, it seems likely that, in many instances, use of a multiplier will produce more accurate cost allocation than currently occurs.
 
 
 [5]
 Punitive damages have frequently been awarded in strict products liability cases in which the premise for liability is the design and distribution of a defective product, rather than fault. See, e.g., Grimshaw v. Ford Motor Co., 119 Cal. App. 3d 757, 174 Cal. Rptr. 348, 383 (Cal. App. 1981) (upholding a jury award of punitive damages against Ford for its manufacture of the Pinto, and holding that "punitive damages are recoverable in a nondeliberate or unintentional tort where the defendant's conduct constitutes a conscious disregard of the probability of injury to others"); Fischer v. Johns-Manville Corp., 103 N.J. 643, 512 A.2d 466, 480 (N.J. 1986) (upholding a jury award of punitive damages against an asbestos manufacturer on a failure to warn theory, and holding that punitive damages were available in strict products liability actions when a manufacturer is "culpably indifferent to an unnecessary risk of injury" and "refuses to take steps to reduce that danger to an acceptable level").
 
 
 [6]
 Cf. Polinsky & Shavell, supra note 4, at 890-91 ("The adjective 'punitive' may sometimes be misleading. . . . Extracompensatory damages may be needed for deterrence purposes in circumstances in which the behavior of the defendant would not call for punishment."); see also Galligan, supra, at 13 (preferring the term "augmented awards" for punitive damages based solely on considerations of deterrence).
 
 
 [7]
 In order to award such socially compensatory damages, the jury would have to calculate the probability that the defendant would otherwise evade full liability for its act. Such a calculation would rarely be precise. A rough estimate, however, would not be more unlikely than many other estimates that courts currently ask juries to make. Thus, juries are routinely required to estimate the monetary value of a plaintiff's pain and suffering, or of the loss sustained by a family as a result of a wrongful death, a sum that "defies any precise mathematical computation." Feldman v. Allegheny Airlines, Inc., 524 F.2d 384, 386 (2d Cir. 1975) (quoting Floyd v. Fruit Indus., Inc., 144 Conn. 659, 136 A.2d 918, 927 (Conn. 1957)) (internal quotation marks omitted); see also 524 F.2d at 392 (Friendly, J., concurring dubitante) (noting the difficulties of making such an estimate). The dangers that might attach to letting fact-finders assess socially compensatory damages could be mitigated by permitting closer judicial control over these damages and by placing the burden on the party seeking such damages to introduce evidence as to the likelihood of escaping liability - for example, proof that the defendant has tried to conceal its act, or evidence of the number of times a particular wrongful act has occurred and the number of lawsuits brought against the defendant. The case before us shows that, at least in some circumstances, it will be readily possible to ascertain how often a particular violation has taken place. Here, records were kept that allowed the City to estimate that about 65,000 arrestees were subjected to the strip-search policy. A 75.
 
 
 [8]
 One could argue that allowing both socially compensatory and punitive awards runs the risk of overdeterrence. But, once the goals of social compensation and punishment are disaggregated, allowing a separate award of punitive damages could represent a societal judgment that, for certain conduct, a cost-benefit analysis is inappropriate. That might be the case, for example, if the "benefit" resulting from the defendant's conduct is socially illicit - perhaps because it consists of pleasure in the victim's pain. This function of punitive damages renders them analogous to criminal penalties that seek not to achieve a socially optimal level of activity, but to discourage or even eliminate a particular activity altogether. See Becker, supra note 4, at 191.
 Of course, to the extent that punitive awards were permitted in order to further this quasi-criminal function, it would be appropriate to reconsider the procedural protections that should attach before such an award can be made. Cf., e.g., Bloom v. Illinois, 391 U.S. 194, 20 L. Ed. 2d 522, 88 S. Ct. 1477 (1968) (distinguishing between civil and criminal contempt and holding that the Seventh Amendment required a jury trial for serious criminal contempt). Indeed, one disadvantage of the current system, which conflates punitive and social deterrence goals, is that what are actually punitive damages rather than socially compensatory damages can be awarded without adequate procedural safeguards and imposed on defendants who are not intentionally wrongful. Cf. cases cited supra note 7.
 
 
 [9]
 In the case of constitutional torts by municipalities, socially compensatory damages could appropriately be paid into a federally administered fund. In other suits against municipalities, however, it would not make much sense to require that the extracompensatory damages be placed into the general state treasury. For the deterrence function would then be diluted, since some of the monies would likely return to the city. Rather, in order to preserve the desired deterrent effect, the damages would more properly be paid to a specific fund whose purpose, at least in theory, would be to attenuate the harm borne by those victims who did not receive compensatory damages. Thus, in cases of environmental damage, the fund might serve environmental purposes, and in auto injury cases, road safety. Such a fund might also be used to compensate victims whose damages had already been assessed to the defendant as a result of the multiplier and who, nevertheless, successfully sued later.
 In establishing and controlling the use of such "limited purpose" funds, one should keep in mind the possible undesirability of having a significant part of general government revenues derive not from taxation, but from tort judgments. This problem is not, however, limited to or even primarily connected with awards of extracompensatory damages. See, e.g., Hanoch Dagan & James J. White, Governments, Citizens, and Injurious Industries, 75 N.Y.U. L. Rev. 354, 364-77 (2000) (discussing the settlement between the states and tobacco products manufacturers, which will require the payment of over $ 200 billion to the states in the next twenty-five years). It therefore must be addressed, if at all, at a more general level.
 
 
 [10]
 This argument is, in effect, the obverse of the Newport Court's assertion that punitive damages imposed on municipalities punish "blameless or unknowing taxpayers." Newport, 453 U.S. at 267. Both contentions depend on an assumption that the municipality and the taxpayers who compose it are wholly distinct entities -- an assumption that, as courts have recognized in the case of corporations, cannot withstand close scrutiny. Thus, in Fischer v. Johns-Manville, the New Jersey Supreme Court, upholding an award of punitive damages against an asbestos manufacturer, rejected defendant's argument that punitive damages "unfairly punished innocent shareholders" and declined its invitation to draw a distinction between a corporation and its shareholders, pointing out that shareholders have the power to affect corporate action:
 It is the corporation, not the individual shareholders, that is recognized as an ongoing legal entity . . . . True, payment of punitive damage claims will deplete corporate assets, which will possibly produce a reduction in net worth and thereby result in a reduction in the value of individual shares. But the same is true of compensatory damages. Both are possible legal consequences of the commission of harmful acts in the course of doing business. To the same extent that damages claims may affect shareholders adversely, so do profitable sales of harmful products redound to their benefit (at least temporarily). These are the risks and rewards that await investors. Also, we would not consider it harmful were shareholders to be encouraged by decisions such as this to give close scrutiny to corporate practices in making investment decisions.
 Fischer, 512 A.2d at 476.
 State courts rejected the doctrine of charitable immunity on similar grounds. See, e.g., Flagiello v. Pennsylvania Hosp., 417 Pa. 486, 208 A.2d 193, 204 (Pa. 1965) (repudiating charitable immunity as "inconsistent with the principle that 'liability should fall upon the party best situated to adopt preventive measures and thereby reduce the likelihood of injury'" (quoting Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 324, 11 L. Ed. 2d 732, 84 S. Ct. 748 (1964)).
 
 
 [11]
 The Supreme Court has held that punitive damages are properly assessed against individual defendants in 1983 actions even for some unintentional violations of constitutional rights. See Smith v. Wade, 461 U.S. 30, 41, 51, 75 L. Ed. 2d 632, 103 S. Ct. 1625 (1983) (holding that punitive damages can be obtained against individual defendants in 1983 cases "without a showing of actual ill will, spite, or intent to injure" where the defendant has exhibited "reckless or callous disregard for plaintiff's rights"). I note that, to the extent that municipalities indemnify their officials against such awards of punitive damages, the distinction drawn by the Newport Court between cities and individual city officials inevitably collapses.
 
 
 KATZMANN, Circuit Judge, concurring in part:
 
 56
 I concur in the result reversing the award of punitive damages. I decline, however, to express a view as to the meaning of footnote 29 in City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 267 n.29, 69 L. Ed. 2d 616, 101 S. Ct. 2748 (1981), beyond the context of the case at hand. As my colleagues observe, the Supreme Court itself provided little guidance as to what constitutes "an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights." Id. I believe that there are too many complexities associated with this idea to permit speculation with regard to a referendum situation not before us.
 
 
 57
 As my colleagues recognize, to the extent that footnote 29 creates an exception, any case justifying punitive damages must satisfy a conjunctive, two-part test, both for direct responsibility and for outrageous abuse. Neither the fact that Ciraolo's strip search occurred pursuant to an established policy adopted by the City of New York, nor that some taxpayers may have voted for the municipal officials responsible for adopting such policy, suffices to bring this case within the scope of any exception contemplated by footnote 29. See supra [pages 11-12]. Accordingly, I decline to join my colleagues in speculating, even with non-binding effect on future courts, as to the hypothetical circumstances under which taxpayers could be held directly responsible, whether in their role as voters or otherwise, including with respect to referenda. Imagining such hypothetical circumstances raises a series of fundamental questions about democratic theory, implicating a host of subtle variables in a system of non-compulsory voting all of which I believe are best considered, not in the abstract, but in the concrete.
 
 
 58
 Whatever the nature of any exception created by footnote 29, I am guided here by the Supreme Court's view in Newport that "such an occurrence is sufficiently unlikely that we need not anticipate it here." 453 U.S. at 267 n.29. With that caution, I concur in the judgment.