APPEL, Justice (concurring in part and dissenting in part).
I. Introduction.
In Baldwin v. City of Estherville (Baldwin II ), 915 N.W.2d 259, 281 (Iowa 2018), the majority of this court decided that a government official could assert a modified qualified immunity defense to a state constitutional tort under article I, sections 1 and 8 of the Iowa Constitution. For reasons expressed in my dissenting opinion in *703 Baldwin II , I was unable to join the majority opinion. Id. (Appel, J., dissenting). I continue to believe there is no immunity available to shield individual state officers from liability for alleged harm caused by their unconstitutional conduct in violation of article I, sections 1 and 8 of the Iowa Constitution. Id.
On the issues raised in this case,[3] I dissent in part from the majority's holding regarding the potential liability of the city. I agree that the city may be held liable for state constitutional torts under a respondeat superior theory. But I do not believe the government entity is entitled to assert a defense of qualified immunity. As expressed in Baldwin II, I do not believe that officers and agents are entitled to qualified immunity, and as a result, such a defense does not pass through to the governmental entity under respondeat superior. Further, even if the individual officers and agents of the government are entitled to quasi-immunity, it should not extend to claims against a municipal entity under respondeat superior.
On the question of punitive damages, I dissent from the majority. In a search and seizure case, for reasons I explain below, it is critical that punitive damages be available against a government entity in a proper case in order to provide an adequate remedy to the state constitutional tort.
On the question of attorney fees, I agree with the majority that attorney fees may be available under the bad faith theory we have long recognized at common law. But I also believe that attorney fees, in an appropriate case, may be available under what has been called the private attorney general theory.
II. Overview of State Constitutional Torts.
At the outset, it is important to understand exactly what a state constitutional tort is. A state constitutional tort is a claim that may be brought by a person for harms by government authorities arising from a violation of a rights-creating provision of the Iowa Constitution. Godfrey v. State , 898 N.W.2d 844, 847 (Iowa 2017). The claim is implied in the substantive provisions of the Iowa Bill of Rights contained in article I of the Iowa Constitution. See id. at 868. It is supported by the basic principle that there is no right without a remedy. Id. at 867. A state constitutional tort arises out of the provisions of the Iowa Bill of Rights and does not require any enabling legislation by the legislature. Id. at 870.
Further, if unconstitutional conduct sufficient to support a state constitutional tort is present, we must next determine whether government defendants are entitled to immunities or affirmative defenses, and if so, what the scope of those immunities or affirmative defenses might be. In Baldwin II , for instance, a majority of this court determined that government officials and agents who engage in certain unconstitutional conduct that harms plaintiffs may assert a modified type of qualified immunity. 915 N.W.2d at 281 (majority opinion).
The legislature may enact statutes that provide for reasonable procedures for the assertion of state constitutional claims. Godfrey , 898 N.W.2d at 873. The legislature, however, cannot limit the substantive scope of state constitutional violations. Id. at 866-69, 874-75. Determining the scope of constitutional rights is the province of the judiciary. Id. To the extent the legislature seeks to regulate remedies, it cannot reduce them below a constitutionally required *704 minimum necessary to ensure adequate vindication of state constitutional interests. Id. at 876.
III. Liability of Municipalities for State Constitutional Torts of Their Officers or Agents.
A. Introduction. The first question posed in this case is whether and under what circumstances a municipality may be held liable for the state constitutional torts of its officers or agents. In considering such questions, at least two lines of cases are frequently examined which, though not binding, may be instructive.
First, common law treatment of municipal liability prior to the enactment of the constitution may be examined. An argument can be made, for example, that the preconstitutional immunities available at common law for claims against municipalities should apply to state constitutional torts in the postconstitutional era. The common law influence theory is based on the proposition that state constitutional founders would have intended any preconstitutional immunities generally available to municipalities when faced with tort claims would also apply to torts arising from state constitutional provisions.
Any analogy between common law and constitutional claims, however, is at best inexact. A constitutional tort is designed not only to provide compensation for injuries but also to vindicate constitutional rights. Id. at 876-79 (plurality opinion); see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics , 403 U.S. 388, 409, 91 S. Ct. 1999, 2011, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring in the judgment). The high importance of ensuring that the basic constitutional rights in the Iowa Bill of Rights are recognized and enforced is wholly absent in ordinary tort litigation against municipalities. Godfrey , 898 N.W.2d at 876-79. A constitutional tort seeks to compensate for harms to the public as well as harms to individuals arising from the unconstitutional conduct of government. Id. Unlike common law claims, constitutional violations are often not accompanied by physical injuries and the deterrence arising from parsimonious compensation for them is often very weak. Michael Wells, Constitutional Remedies, Section 1983 and the Common Law , 68 Miss. L.J. 157, 215 (1998). For these reasons, a constitutional tort is thus said to be "a fundamentally different legal artifact from common law tort." Id. at 159 ; see also Sheldon H. Nahmod, Section 1983 and the "Background" of Tort Liability , 50 Ind. L.J. 5, 32-33 (1974) ("[C]ourts in 1983 cases must be careful not to let tort law alone determine 1983 liability; for not only possibly different purposes, but different interests as well are usually at stake."). We should be careful not to allow common law limitations to impede the vindication of state constitutional rights.
Further, there is a certain amount of irony in the referral to common law doctrine in determining the scope of recovery for constitutional harms under 42 U.S.C. § 1983 (2017). Indeed, one of the reasons why § 1983 was passed was the inadequacy of common law remedies to protect citizens from constitutional violations. Monroe v. Pape , 365 U.S. 167, 173-74, 81 S. Ct. 473, 477, 5 L.Ed.2d 492 (1961), overruled on other grounds by Monell v. Dep't of Soc. Servs. , 436 U.S. 658, 690, 98 S. Ct. 2018, 2035, 56 L.Ed.2d 611 (1978) ; see Note, Damage Awards for Constitutional Torts: A Reconsideration After Carey v. Piphus, 93 Harv. L. Rev. 966, 976 (1980).
Finally, the genius of the common law was its flexibility and its ability to evolve to meet contemporary realities. Thus, the common law method requires us not to adopt frozen concepts of the past but to study them and adapt them, where appropriate, *705 to the present. Nahmod, 50 Ind. L.J. at 33. While the historical common law approach may inform us, it cannot control the present.
The second approach to analyzing constitutional torts involves examination of cases under the Civil Rights Act of 1871, codified at 42 U.S.C. § 1983. Section 1983 provides a statutory avenue for injured parties to bring claims based on, among other things, violations of the United States Constitution. Cases under § 1983 have considered the scope of liability and potential immunities available to government actors when constitutional violations arise.
In looking at the § 1983 cases for illumination in the context of state constitutional torts, there are three important caveats. First, the cases under § 1983 are statutory in nature and often turn on the specific language and statutory history that is not germane to interpretation of a state constitutional tort.
Second, and of great importance, a plaintiff in a § 1983 action seeks to thrust federal courts into the operations of state and local governments. As a result of federalism implications, the § 1983 cases of the United States Supreme Court seek to minimize federal intervention in these local matters. See Note, Developments in the Law: Section 1983 and Federalism , 90 Harv. L. Rev. 1133, 1179 (1977). The end result is a tendency in the § 1983 cases to underenforce federal constitutional rights. Thus, while the § 1983 cases are worth a careful read, it must be understood that they are substantially influenced by the diluting federalism concerns that have no application at all when a state court considers the scope, defenses, or remedies available to vindicate state constitutional claims.
Third, in recent years, the United States Supreme Court has adopted a rights-restricting approach to many aspects of constitutional law. It has utilized a wide host of fairly technical legal doctrines such as pleading standards, Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ; Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007), standing doctrine, City of Los Angeles v. Lyons , 461 U.S. 95, 105-06, 103 S. Ct. 1660, 1667, 75 L.Ed.2d 675 (1983) (denying injunction against police chokeholds because plaintiff had only been injured once), and state-leaning approaches to summary judgment, see, e.g. , Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986), that tend to materially lessen the scope of judicial remedies available for alleged constitutional violations. For those who seek to avoid slippage between constitutional norms and their enforcement, recent United States Supreme Court cases may have limited utility.
B. Common Law History of Municipal Liability. There are many common law cases addressing the potential liability of municipalities in tort that predate state or federal constitutions. The verdict of common law history is clear: municipalities at common law were generally liable in tort to the same extent as corporations or any other private parties. Specifically, there were virtually no authorities suggesting, for instance, that a municipality was entitled to some kind of good-faith immunity. See Owen v. City of Independence , 445 U.S. 622, 641-42, 100 S. Ct. 1398, 1411, 63 L.Ed.2d 673 (1980) (citing cases).
The Iowa common law cases are consistent with the general rule. See Cotes v. City of Davenport , 9 Iowa 227, 235 (1859) (stating it is well established that a municipal corporation is liable in a negligence case to the same extent as a private person). Thus, to the extent common law is our guide, municipalities should not be entitled *706 to quasi-immunity for their state constitutional torts.
C. Approaches of United States Supreme Court Caselaw Under 42 U.S.C. § 1983. In a series of cases, the United States Supreme Court has considered the scope of potential liability of municipalities under the Civil Rights Act of 1871. 42 U.S.C. § 1983. In Monroe , 365 U.S. at 169, 81 S. Ct. at 474, petitioners alleged that thirteen police officers broke into their home, made them stand naked in the living room, ransacked all the rooms of the house, took them to the station for ten hours, interrogated them, and then released them, all without a warrant. With respect to individual defendants, the Monroe Court concluded that they acted under color of law under § 1983 and, as a result, reversed lower court rulings to the contrary. See id. at 187, 81 S. Ct. at 484. With respect to the City of Chicago as defendant, however, the Monroe Court held that municipalities were not "persons" under § 1983 and could not be held accountable under the statute for inflicting state constitutional harms. Id. at 187-92, 81 S. Ct. at 484-86.
Seventeen years after Monroe , however, the Supreme Court reversed course in Monell , 436 U.S. at 690, 98 S. Ct. at 2035. In Monell , female employees of New York governmental entities challenged a policy that "compelled pregnant employees to take unpaid leaves of absence before such leaves were required for medical reasons." Id. at 660-61, 98 S. Ct. at 2020. The Monell Court overruled Monroe in part and held that municipalities were persons under § 1983. Id. at 690, 98 S. Ct. at 2035. Further, the Monell Court declared that municipalities could be held liable under § 1983 when officials were executing "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Id. at 690, 98 S. Ct. at 2035-36.
But the Monell Court further held that Congress did not intend for a municipality to be held liable "solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 691, 98 S. Ct. at 2036. In reaching this conclusion, the Monell Court emphasized the word "causes" in the statute. Id. at 692, 98 S. Ct. at 2036. The Monell Court reasoned that in order for the municipality to cause the constitutional infringement, there must be a policy or practice giving rise to it. Id. at 694, 98 S. Ct. at 2037-38. In the case presently before us, the city urges that we import the Supreme Court's statutory interpretation in Monell into the substance of our state constitutional law.
In Monell , the Supreme Court expressly noted that the question of whether local government bodies were entitled to some form of official immunity was not presented in the case. Id. at 701, 98 S. Ct. at 2041. While the Monell Court made clear that absolute immunity would not be appropriate, it took no view on any other form of immunity that might be available. Id.
The Supreme Court addressed the question of whether a municipality was entitled to some form of immunity in Owen , 445 U.S. at 635, 100 S. Ct. at 1407. In Owen , a former police chief brought an action against the city, the city manager, and members of the city council alleging he was terminated from employment without notice and an opportunity to be heard. Id. at 630, 100 S. Ct. at 1404-05. The Owen Court rejected the city's assertion that it was entitled to qualified immunity. Id. at 638, 100 S. Ct. at 1409. The Owen Court noted the statute itself did not contain any immunities. Id. at 635, 100 S. Ct. at 1407. Further, the Owen Court canvassed the legislative history of the Civil Rights Act *707 and found no support for some form of municipal immunity. Id. at 635-38, 100 S. Ct. at 1407-09. The Owen Court further reviewed caselaw, concluding that it was generally understood that a municipality's tort liability was identical to private organizations and individuals. Id. at 639-50, 100 S. Ct. at 1409-15.
The Owen Court proceeded to consider the public policy purposes of recovery for constitutional wrongs. The Owen Court noted,
A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed.
Id. at 651, 100 S. Ct. at 1415.
The Owen Court noted, however, that individual defendants under § 1983 had been afforded qualified immunity. Id. at 651, 100 S. Ct. at 1415. Because of the presence of qualified immunity for individual officers, the Owen Court noted that "victims of municipal malfeasance would be left remediless if the city were also allowed to assert a good-faith defense." Id. The Owen Court emphasized that absent countervailing considerations to the contrary, the injustice of a victim going without a remedy "should not be tolerated." Id.
The Owen Court found no countervailing considerations and emphasized the need to deter future violations. Id. at 651, 100 S. Ct. at 1416. The Owen Court noted that potential liability "should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights." Id. at 651-52, 100 S. Ct. at 1416. The Owen Court further observed that "[i]t hardly seems unjust to require a municipal defendant which has violated a citizen's constitutional rights to compensate him for the injury suffered thereby." Id. at 654, 100 S. Ct. at 1417. Additionally, the Owen Court cited a leading state court case for the proposition that "the city, in its corporate capacity, should be liable to make good the damage sustained by an [unlucky] individual." Id. at 654-55, 100 S. Ct. at 1417 (alteration in original) (quoting Thayer v. City of Boston , 36 Mass. 511, 515 (1837) ).
Finally, the Owen Court noted that the purpose of qualified immunity for individual officers "is the concern that the threat of personal monetary liability will introduce an unwarranted and unconscionable consideration into the decisionmaking process, thus paralyzing the governing official's decisiveness and distorting his judgment on matters of public policy." Id. at 655-56, 100 S. Ct. at 1418. The Owen Court emphasized, however, that the inhibiting effect is significantly reduced when municipal liability is involved. Id. at 656, 100 S. Ct. at 1418. The Owen Court observed that it is questionable whether the possibility of municipal liability will deter decision-makers from conscientious exercise of public authority. Id. In any event, the Owen Court regarded deterrence in positive terms, noting concerns that should shape decision-making include the constitutional rights of persons affected by the action. Id.
The Supreme Court next considered the question of immunities in City of Oklahoma City v. Tuttle , 471 U.S. 808, 810, 105 S. Ct. 2427, 2429, 85 L.Ed.2d 791 (1985). Here, a widow of a man shot by a police officer brought a § 1983 claim alleging that her husband had been killed without due process of law as a result of a city providing inadequate training to police officers. Id. at 811-12, 105 S. Ct. at 2430. The jury returned a verdict in favor of the police officer but awarded $1,500,000 *708 against the city. Id. at 813, 105 S. Ct. at 2431. The United States Court of Appeals for the Tenth Circuit affirmed. Tuttle v. City of Oklahoma City , 728 F.2d 456, 461 (10th Cir. 1984).
The Tuttle Court reversed. 471 U.S. at 814, 105 S. Ct. at 2431. The Tuttle Court emphasized that the plaintiff offered no evidence of a single act by a municipal policymaker but only based her claim on a single incident involving the use of excessive force and a subsequent inference that the training of the officer must have been inadequate as a result of city policy. Id. at 821, 105 S. Ct. at 2435. The Tuttle Court emphasized that liability could not be imposed because the municipality hired one "bad apple." Id. The Tuttle Court declared that liability under Monell cannot be established without proof that the harm was "caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." Id. at 824, 105 S. Ct. at 2436.
Notably, Justice Stevens dissented. Id. at 834, 105 S. Ct. at 2441 (Stevens, J., dissenting). Justice Stevens emphasized that at the time § 1983 was enacted, the doctrine of respondeat superior was well recognized in the common law. Id. at 835, 105 S. Ct. at 2442. Justice Stevens further noted that § 1983 was designed primarily to provide a remedy for constitutional violations, which he characterized as "wrongs of the most serious kind." Id. at 839, 105 S. Ct. at 2444. He pointed out that the act of the individual officer could be considered unconstitutional only if he was acting on behalf of the state. Id. Justice Stevens reasoned that if an officer's conduct was sufficient to satisfy state action requirements, the municipality should be liable under ordinary principles of tort law. Id. at 839-40, 105 S. Ct. at 2444-45.
In closing, Justice Stevens emphasized that respondeat superior liability should apply with special force because of the special quality of the interests at stake. Id. at 843, 105 S. Ct. at 2446. He argued that the interests in compensating the victim, deterring violations by creating sound municipal policy, and providing fair treatment toward individual officers performing difficult and dangerous work all point toward placing primary responsibility on the municipal corporation. Id. at 843-44, 105 S. Ct. at 2446-47.
The question of liability under § 1983 arose again in Pembaur v. City of Cincinnati , 475 U.S. 469, 471, 106 S. Ct. 1292, 1294, 89 L.Ed.2d 452 (1986). In Pembaur , a physician brought a § 1983 action after sheriff's deputies chopped down the door of his office with an axe in an attempt to serve legal process on two of his employees. Id. at 473-74, 106 S. Ct. at 1295. The district court dismissed the action and the Sixth Circuit affirmed in part and reversed in part. Id. at 475, 106 S. Ct. at 1296.
In an opinion by Justice Brennan, the Pembaur Court held that the county could be liable under § 1983 under the facts presented. Id. at 484, 106 S. Ct. at 1300. In Pembaur , the decision to forcibly enter the physician's office was made in consultation with the county prosecutor. Id. The Pembaur Court noted a single decision made by an authorized municipal policymaker may amount to a policy under Monell . Id. at 480, 106 S. Ct. at 1298. According to the Pembaur Court, liability under § 1983 could be established when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Id. at 483, 106 S. Ct. at 1300.
Justice Stevens wrote separately. Id. at 487, 106 S. Ct. at 1302 (Stevens, J., concurring in part and concurring in the judgment). He emphasized, again, that § 1983 *709 was intended to impose liability on the government for illegal acts, including those performed by agents in the course of their employment. Id. at 489, 106 S. Ct. at 1303. According to Justice Stevens, the primary responsibility for protecting the constitutional rights of the residents of the county rested on the shoulders of the county itself rather than on agents that were trying to do their jobs. Id. at 490, 106 S. Ct. at 1304. According to Justice Stevens, "The county has the resources and the authority that can best avoid future constitutional violations and provide a fair remedy for those that have occurred in the past." Id.
Finally, the Supreme Court considered § 1983 liability in Board of County Commissioners v. Brown , 520 U.S. 397, 400, 117 S. Ct. 1382, 1386, 137 L.Ed.2d 626 (1997). In Brown , the plaintiff brought a § 1983 action in connection with injuries suffered at a traffic stop where she was forcibly removed from her automobile after it had been pulled over. Id. at 399-400, 117 S. Ct. at 1386. A verdict was entered for the plaintiff. Id. at 400, 117 S. Ct. at 1386. The Fifth Circuit affirmed, finding that the county could be held liable for a sheriff's single decision to hire a deputy after an inadequate background check. Id.
The Brown Court held that the plaintiff had not established a basis for liability under § 1983. Id. The Brown Court concluded that the mere hiring by the sheriff of a deputy whose qualifications might later be questioned did not establish a policy under Monell . Id. at 404-05, 117 S. Ct. at 1388-89. The Brown Court emphasized the need to show causation and fault in order to establish § 1983 liability. Id. at 406-07, 117 S. Ct. at 1389-90.
Justice Breyer dissented. Id. at 430, 117 S. Ct. at 1401 (Breyer, J., dissenting). He squarely took on Monell . See id. He noted that the rejection of respondeat superior in Monell rested on poor history. Id. at 431, 117 S. Ct. at 1401. Justice Breyer criticized the caselaw splitting hairs over what amounted to "policy" under Monell . Id. at 433-34, 117 S. Ct. at 1402-03. Finally, Justice Breyer noted that current developments, including the trend of cities indemnifying officers for their constitutional torts, suggest Monell may be outdated. Id. at 436, 117 S. Ct. at 1403-04.
D. Discussion of Respondeat Superior Liability. At the outset, I would decline the city's request that we cut and paste the Monell "policy or custom" approach into the caselaw on Iowa constitutional torts. As demonstrated by Justice Stevens, the historical argument rejecting respondeat superior is simply wrong. Tuttle , 471 U.S. at 835, 105 S. Ct. at 2442. Further, from a policy perspective, as again noted by Justice Stevens, the municipal entities themselves are in the best position to modify their conduct and the conduct of employees in a fashion to secure compliance with constitutional demands. Pembaur , 475 U.S. at 490, 106 S. Ct. at 1304 ; Tuttle , 471 U.S. at 843-44, 105 S. Ct. at 2446-47. Therefore, from a deterrence perspective, it makes sense to apply respondeat superior in the case of constitutional torts. Further, experience has shown that proving policy or custom is exceedingly problematic. The Monell doctrine has introduced unnecessary complexity into the law. See Brown , 520 U.S. at 433-37, 117 S. Ct. at 1402-04.
In addition, one of the reasons for the adoption of the Monell doctrine was to avoid thrusting federal courts into local affairs. See City of Canton v. Harris , 489 U.S. 378, 392, 109 S. Ct. 1197, 1206, 103 L.Ed.2d 412 (1989) (noting respondeat superior would lead to endless exercise of second-guessing municipal employee training programs and would implicate serious problems of federalism). The federalism problems simply are not present when the claims are brought in a local state court.
*710 The next question is whether we should import qualified immunity to claims against the municipality. In Baldwin II , the majority found a modified form of qualified immunity applied to officers and agents of the state. 915 N.W.2d at 281. But that does not necessarily mean the same type of immunity is available for municipal entities. On the question of quasi-immunity for municipal entities, I think the proper answer is no for the following reasons.
First, I note that qualified immunity for municipal entities was not part of the common law. See Owen , 445 U.S. at 641-42, 100 S. Ct. at 1411. While plainly not dispositive, the lack of qualified immunity at common law certainly undermines one of the rationales for rejecting respondeat superior. The notion of respondeat superior liability for municipal entities similar to that applicable to corporations has not proven problematic.
Second, a damages remedy "is a vital component of any scheme for vindicating cherished constitutional guarantees." Id. at 651, 100 S. Ct. at 1415. Respondeat superior liability of a municipal entity ensures that where there is a right, there is a remedy. See generally Bivens , 403 U.S. at 400 n.3, 91 S. Ct. at 2007 n.3 (noting "modes of jurisprudential thought" at the time of the United States Constitutional Convention that "appeared to link 'rights' and 'remedies' in a 1:1 correlation"). Without it, there will be a gap between established constitutional rights and the remedies available to vindicate those rights. From a practical perspective, the municipal entity is in a good position to pay compensation and spread the cost among taxpayers.
And, the majority's decision in Baldwin II to adopt a modified form of qualified immunity strengthens the case for adoption of respondeat superior for claims against municipalities. As noted by Justice Brennan, "[M]any victims of municipal malfeasance would be left remediless if the city were also allowed to assert a good-faith defense. Unless countervailing considerations counsel otherwise, the injustice of such a result should not be tolerated." Owen , 445 U.S. at 651, 100 S. Ct. at 1415.
Third, as noted by Justice Stevens, the municipal entity itself is likely to be in the best position to implement corrective measures to vindicate constitutional rights. Pembaur , 475 U.S. at 490, 106 S. Ct. at 1304 ; Tuttle , 471 U.S. at 843-44, 105 S. Ct. at 2446-47. If a municipal entity is liable for state constitutional torts of its officers and agents, there will be a strong incentive to make sure training programs are adequate and that hiring processes properly screen potential city employees. Liability against an individual officer does not offer a similar prospect of forward-looking action to lessen the risk of future unconstitutional conduct.
Finally, for the reasons expressed in my dissent in Baldwin II , I do not believe that municipal officers and agents are entitled to qualified immunity. 915 N.W.2d at 281 (Appel, J., dissenting). As a result, from my perspective, just as the agent or employee had no qualified immunity defense, the municipality under respondeat superior would have no qualified immunity defense.
IV. Liability of the City for Punitive Damages.
A. Introduction. One of the most remarkable developments in law occurred in England during the late eighteenth century. The story is old but good. John Wilkes was, literally, a royal pain, an irreverent, in your face, irresponsible, arrogant, impulsive, and disrespectful dandy. Arthur H. Cash, John Wilkes: The Scandalous Father of Civil Liberty 1-2 (2006) [hereinafter Cash]. Some of us probably would *711 not have liked him. After the publication of a scurrilous article appeared in a political magazine attacking the king and his advisors, the government went on a rampage, searching dozens of locations and seizing scores of people-the usual suspects, no doubt-for telltale signs of responsibility, or complicity, in the article's publication. Thomas K. Clancy, The Fourth Amendment: Its History and Interpretation 36 (1st ed. 2008) [hereinafter Clancy]; Phillip A. Hubbart, Making Sense of Search and Seizure Law: A Fourth Amendment Handbook 41 (1st ed. 2005) [hereinafter Hubbart]; Nelson B. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 43 (1937) [hereinafter Lasson]. Wilkes was seized and his living quarters searched as part of the general dragnet. Clancy at 36; Lasson at 44; Andrew E. Taslitz, Reconstructing the Fourth Amendment: A History of Search and Seizure, 1789- 1868 at 20 (2006) [hereinafter Taslitz].
It turned out that the King and his retainers picked on the wrong guy. He sued those responsible for an unlawful search and won substantial judgments in English courts. See Wilkes v. Wood (1763) 98 Eng. Rep. 489, 489, 498-99; Hubbart at 42; Lasson at 45. He received substantial punitive damages against the individual officers involved. Wilkes , 98 Eng. Rep. at 498; see Hubbart at 42; Lasson at 45. The Wilkes cases were a seminal rule of law development, holding the King's agents personally liable for unlawful conduct.
Wilkes' success in the courts won wide international acclaim. His name was well known in the American colonies. Cash at 2; Hubbart at 47; Taslitz at 21. His birthday was widely celebrated in the New World, and he carried on correspondence with prominent Americans. Cash at 2; Hubbart at 47; Taslitz at 21. In the famous Paxton's case , James Otis waxed eloquent about the events across the ocean, thrilling a young lawyer in the audience, John Adams. Jacob W. Landynski, Search and Seizure and the Supreme Court: A Study in Constitutional Interpretation 34-37 (1966) (quoting 10 John Adams, Life and Works of John Adams 247-48 (1856)). It is an unpleasant but revealing fact that John Wilkes Booth got his middle name from the Englishman, the point being that Wilkes and his successes in court over the exercise of arbitrary government power were well known through America decades after the events in question. See Josh Chafetz, Impeachment and Assassination , 95 Minn. L. Rev. 347, 389 (2010).
There is no question that the generation of Iowans who established statehood knew the Wilkes story. The Iowa Supreme Court cited one of his cases in 1855. Sanders v. State , 2 Iowa 230, 239 (1855). Today, however, Wilkes seems to have been forgotten, or perhaps more accurately ignored, by ahistorical thinkers who view punitive damages as a virus that needs to be isolated and ultimately eradicated. But historically, the awards of punitive damages for illegal government searches and seizures in the Wilkes cases were thought to represent an epic success in the effort to control unbridled government power.
The Wilkes cases did not involve claims for punitive damages against government entities, only against the officers. They do, however, stand for the proposition that punitive damages in general can play an important part in vindicating the public's interest in restraining arbitrary government. And, the Wilkes cases are a predicate to an important question: if punitive damages are available against individual defendants, why should they not be available against municipalities?
B. Punitive Damages Against Municipalities at Common Law. As a general rule, municipalities at common law historically *712 were not subject to punitive damages. For instance, in Bennett v. City of Marion , 102 Iowa 425, 426, 71 N.W. 360, 360 (1897), the court held punitive damages were not available against a municipal corporation.
The court, however, took a different tack in Young v. City of Des Moines , 262 N.W.2d 612, 614 (Iowa 1978) (en banc). In Young , the plaintiff brought a claim for false arrest against the city. Id. The Young court noted that given the developments in tort law in Iowa, liability is now the rule, with immunity being the exception. See id. at 620-21. The Municipal Tort Claims Act did not expressly exclude punitive damages. Id. at 622.
The Young court acknowledged that the weight of authority at the time was against allowing such damages absent a statute expressly allowing them. Id. at 621. The Young court canvassed the public policy rationale for excluding punitive damages and found them unpersuasive. Id. at 621-22. The Young court noted that "if a governmental subdivision be held answerable in punitive damages, more care will go into the selection and training of its agents and employees." Id. at 621-22. The Young court further declared it was not convinced that the wealth of the municipality is a problem as the amount of punitive damages was determined by the sound judgment of the jury, subject to judicial review. Id. at 622. The Young court declared that, where appropriate, punitive damages against governmental subdivisions "will further deter unfounded and oppressive peace officer conduct under the guise of official action." Id. The Young court noted, however, that if the legislature intended to bar punitive damages, it could amend the applicable statute. Id.
Several years later, the legislature amended the Iowa Municipal Tort Claims Act to bar an award of punitive damages against municipalities for cases in tort, partially abrogating Young . 1982 Iowa Acts ch. 1018, § 5 (codified at Iowa Code § 613A.4(5) (1983), now Iowa Code § 670.4(e ) (2019)). In Parks v. Marshalltown , 440 N.W.2d 377, 379 (Iowa 1989), the court considered the validity of an award of punitive damages in a case involving a verdict in favor of the plaintiff on a breach of contract theory. The Parks court reasoned that if punitive damages were not available in a tort action, they should not be available in a contract action. Id. The Parks court did not consider the validity of the legislation as applied to constitutional torts. See id.
C. Discussion of Punitive Damages in Godfrey . In Godfrey , 898 N.W.2d at 847 (majority opinion), we held that a plaintiff could bring a state constitutional tort for violations of equal protection and due process brought against government officials. With respect to the equal protection claim, the defendants argued that the remedies provided by the Iowa Civil Rights Act were exclusive and that a constitutional tort based on equal protection could not be brought outside the statute. Id. at 849, 873. Because the Iowa Civil Rights Act did not provide for punitive damages, a question arose whether the remedies provided by the statute were "adequate" to vindicate the constitutional rights of the plaintiff. Id. at 875.
Three members of the court concluded that the remedy provided by the Iowa Civil Rights Act was not adequate because of the lack of a punitive damages provision. Id. at 876-79 (plurality opinion). Chief Justice Cady wrote the determinative opinion. Id. at 880-81 (Cady, C.J., concurring in part and dissenting in part). He reasoned that punitive damages might well be a required remedy in some state constitutional tort but not on the claim presented in Godfrey . Id. at 881. He specifically left the door open for an award of punitive *713 damages in Wilkes -type cases. Id. For the majority of the Godfrey court, it seems clear as a matter constitutional law that punitive damages should be available in at least some cases notwithstanding legislative action to the contrary. Id. at 876-79 (plurality opinion); id. at 880-81 (Cady, C.J., concurring in part and dissenting in part).
D. Punitive Damages Against Municipalities for Constitutional Torts in the United States Supreme Court. The seminal United States Supreme Court case regarding recovery of punitive damages against a municipality in a § 1983 case is City of Newport v. Fact Concerts, Inc. , 453 U.S. 247, 249, 101 S. Ct. 2748, 2750, 69 L.Ed.2d 616 (1981). In City of Newport , an organization licensed to present music concerts and a rock concert promoter sued the city and city officials under § 1983 for cancelling a music concert license. Id. at 252, 101 S. Ct. at 2752. The jury returned a verdict in favor of the plaintiffs and awarded compensatory and punitive damages, including a punitive damage verdict against the city of $200,000. Id. at 253, 101 S. Ct. at 2752. The First Circuit affirmed. Fact Concerts, Inc. v. City of Newport , 626 F.2d 1060, 1061 (1st Cir. 1980).
The City of Newport Court vacated the court of appeals' opinion. 453 U.S. at 271, 101 S. Ct. at 2762. The City of Newport Court noted that at common law, immunity of municipal corporations from punitive damages was not subject to serious question and continues to be the law in a majority of jurisdictions. Id. at 259, 101 S. Ct. at 2756. Because immunity from punitive damages was established at common law, the City of Newport Court proceeded on the assumption that Congress would have specifically addressed the issue had it intended to allow liability for punitive damages under § 1983. Id. at 263, 101 S. Ct. at 2758.
Turning to public policy, the City of Newport Court observed that an award of punitive damages against a municipality punishes taxpayers. Id. at 267, 101 S. Ct. at 2760. While the City of Newport Court recognized it had previously suggested that punitive damages might in appropriate circumstances be awarded to punish violations of constitutional rights, the Court said that the retributive purpose was not significantly advanced by exposing municipalities to punitive damages. Id. at 268, 101 S. Ct. at 2760.
The City of Newport Court also declared that it was "far from clear" that municipal officers would be deterred by an award of punitive damages. Id. at 268-69, 101 S. Ct. at 2760-61. The City of Newport Court stated that a more effective remedy would be to assess punitive damages against the offending public officials. Id. at 269, 101 S. Ct. at 2761. In footnote 29, however, the City of Newport Court stated that "[i]t is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights" but that such a scenario was sufficiently unlikely that the Court "need not anticipate it here." Id. at 267 n.29, 101 S. Ct. at 2760 n.29.
Following City of Newport , plaintiffs have attempted to evade its holding by pointing to footnote 29. For example, in Webster v. City of Houston , 689 F.2d 1220, 1221 (5th Cir. 1982), plaintiff claimed the police had adopted a custom of carrying guns or knives as "throw downs" to be planted near suspects who are shot in dubious circumstances. The Fifth Circuit, though finding the plight of the plaintiff "reprehensible," held that the actions were not sufficiently outrageous to support a punitive damages claim against the municipality under footnote 29 of City of Newport . Id. at 1229. Similarly, in *714 Heritage Homes of Attleboro, Inc. v. Seekonk Water District , 670 F.2d 1, 2 (1st Cir. 1982), the First Circuit declined to allow punitive damages where some voters engaged in "blatant raci[st] discussions" before the water district voted to exclude a housing developer willing to sell units to black families. The First Circuit reasoned that only a small claque of voters engaged in the commentary and that there was no widespread knowledgeable participation by taxpayers of the district. Id.
Perhaps the most interesting response to City of Newport occurred in Ciraolo v. City of New York , 216 F.3d 236 (2d Cir. 2000). In this case, Judge Calabresi wrote both the majority opinion and a concurring opinion. Id. at 237 (majority opinion); id. at 242 (Calabresi, J., concurring). In Ciraolo , a plaintiff claimed that after she was arrested on misdemeanor charges in connection with a spat with her neighbor, she was taken to jail, ordered to strip naked, and made to bend down and cough while visually inspected. Id. at 237 (majority opinion). The city conceded liability as there was a uniform policy to strip search all females upon their arrival at the jail, and a trial was held on the question of damages. Id. at 238. A jury awarded the plaintiff $19,645 in compensatory damages and $5,000,000 in punitive damages. Id.
In his majority opinion, Judge Calabresi found that footnote 29 in City of Newport was not designed to allow punitive damages for especially outrageous misconduct but instead, at most, was designed to address a situation where taxpayers themselves participate in the unlawful action such as where taxpayers adopt an unconstitutional policy through a referendum. Id. at 240. Under the circumstances, Judge Calabresi, for the court, reversed the award of punitive damages. Id. at 242.
In his concurring opinion, Judge Calabresi expressed that although the result in the case was compelled by the Supreme Court, he believed a better outcome would have been to allow punitive damages. Id. at 242 (Calabresi, J., concurring). Judge Calabresi wrote that punitive damages can ensure a wrongdoer bears all the costs of action where compensatory damages alone result in "systematic underassessment of costs, and hence in systematic underdeterrence." Id. at 243. Judge Calabresi noted that not all persons injured by an unconstitutional action by a municipality will sue, either because compensatory damages are likely to be relatively low or because their knowledge and access to the legal process are poor and unsophisticated. Id . at 243-44.
As a result, compensatory damages in a wide category of cases are an inaccurate indicator of the true level of harm inflicted by government conduct. Id. at 244; see A. Mitchell Polinsky & Steven Shavell, Punitive Damages: An Economic Analysis , 111 Harv. L. Rev. 869, 889 (1998). Judge Calabresi noted that although extracompensatory damages have been labeled "punitive damages," a more appropriate name for such damages designed to avoid underdeterrence might be "socially compensatory damages." Ciraolo , 216 F.3d at 245. Judge Calabresi emphasized that once it is recognized that remedying underdeterrence is an appropriate function of extracompensatory damages against a municipality, and that this goal is separate from punishment, the objections to punitive damages lose much of their force. Id. at 248.
E. Discussion of Availability of Punitive Damages in Actions Against Municipalities. In considering the availability of punitive damages against municipalities, it is important to begin the discussion with a recognition of the difference between a private dispute between two parties and a state constitutional tort claim against government. The latter involves only private *715 interests, but the former is imbued with an important public interest. Bivens , 403 U.S. at 409, 91 S. Ct. at 2011 (Harlan, J., concurring in the judgment); Godfrey , 898 N.W.2d at 876-79 (plurality opinion). That important public interest is in ensuring that government not violate the fundamental rights enshrined in the very first article of the Iowa Constitution, the provision characterized as "the most important provisions" of the entire constitution. Godfrey , 898 N.W.2d at 870 (majority opinion).
Further, in examining the question of deterrence, Calabresi has it right, namely, that in addition to specific deterrence involving the parties to a controversy, there is the question of general deterrence, or what he calls "socially compensatory damages." Ciraolo , 216 F.3d at 245. In this context, it is important that payment of relatively small amounts to particular litigants do not become a license for unconstitutional conduct that simply becomes a routine part of overhead for government operations.
In considering the deterrence issue, the City of Newport Court questioned whether a punitive damage award against a public entity would be effective. City of Newport , 453 U.S. at 268-69, 101 S. Ct. at 2760-61. But a year earlier in Owen , the Court indicated that compensatory damages would create an incentive for government to conform its conduct to constitutional concerns. 445 U.S. at 651-52, 100 S. Ct. at 1415 ; see Michael Wells, Punitive Damages for Constitutional Torts , 56 La. L. Rev. 841, 866 (1996). If compensatory damages against a government entity provide deterrence, it is hard to see why punitive damages would not also deter.
Yet, while punitive damages should not be categorically unavailable, they are not appropriate in an ordinary case involving liability solely arising because of respondeat superior principles. Instead, liability should arise only where the unconstitutional conduct arises to willful and wanton misconduct. Where there is exposure to punitive damages, the potential unconstitutional actions will be "squarely on the radar screens of responsible officials." Myriam E. Gilles, In Defense of Making Government Pay: The Deterrent Effect of Constitutional Tort Remedies , 35 Ga. L. Rev. 845, 873 (2001). Thus, the reprehensive policies such as conducting body cavity searches on all misdemeanor female defendants arriving at the jail as in Ciraolo would be subject to an award of punitive damages.
In my view, maintaining the adequacy of remedies for state constitutional torts is the responsibility of this court. The legislature can establish reasonable processes for the prosecution of constitutional torts but cannot substantively reduce the available remedies below a constitutionally acceptable point. Godfrey , 898 N.W.2d at 876-79 (plurality opinion). In the narrow class of cases mentioned above, I would insist on the availability of punitive damages against the municipality notwithstanding legislative action that seeks to limit the availability of the remedy.
Regretfully, the majority does not agree. But the majority's acceptance of the legislature's limitation on punitive damages against municipal entities for constitutional torts is, or at least in my view should be, dependent upon the availability of punitive damages in Wilkes -type actions. Although a Wilkes -type case imposing punitive damages upon individual actors is not before us, we must approach immunity issues in a systemic fashion. Otherwise, comparatively narrow applications of rights-restrictive doctrine may be palatable at each step but cumulatively create an unacceptable regime for state constitutional torts. This observation is consistent with the Supreme Court's approach in City of Newport , *716 where the refusal to extend punitive damage liability to municipalities rested, at least in part, on the availability of punitive damages against an individual officer.
V. Attorney Fees for Constitutional Torts Under Common Law Exceptions to the American Rule.
The last question is whether the plaintiff in this case might be entitled to attorney fees. There is no state statute authorizing attorney fees for successful prosecution of state constitutional torts. We have followed the American rule that attorney fees "are generally not recoverable as damages in the absence of a statute or a provision in a written contract." Botsko v. Davenport Civil Rights Comm'n , 774 N.W.2d 841, 845 (Iowa 2009) (quoting Kent v. Emp't Appeal Bd. , 498 N.W.2d 687, 689 (Iowa 1993) (per curiam)). While the general rule is that attorney fees are not recoverable absent a statute or contractual provision, the question in this case is whether there are exceptions to the general rule that may be applicable.
The majority has concluded that attorney fees in this case may be awarded if the opposing party "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines, Inc. , 510 N.W.2d 153, 158 (Iowa 1993) (quoting Alyeska Pipeline Serv. Co. v. Wilderness Soc'y , 421 U.S. 240, 258-59, 95 S. Ct. 1612, 1622, 44 L.Ed.2d 141 (1975) ). This common law exception to the general rule against award of attorney fees is well established and may well be applicable in this case depending upon the ultimate factual showing made at trial.
The plaintiff in this case, however, presents another reason for an award of attorney fees. The plaintiff asserts another common law exception to the general American rule, namely, that attorney fees and costs may be awarded under a "private attorney general" theory. The private attorney general theory as a basis for an award of attorney fees has been embraced in many states. See, e.g. , Arnold v. Ariz. Dep't of Health Servs. , 160 Ariz. 593, 775 P.2d 521, 537 (1989) (en banc); Serrano v. Priest , 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303, 1315 (1977) (en banc); Sierra Club v. Dep't of Transp. , 202 P.3d 1226, 1270 (Haw. 2009) ; Hellar v. Cenarrusa , 106 Idaho 571, 682 P.2d 524, 531 (1984) ; Bedard v. Town of Alexandria , 159 N.H. 740, 992 A.2d 607, 611 (2010) ; Deras v. Myers , 272 Or. 47, 535 P.2d 541, 550 (1975) (en banc). See generally Ann K. Wooster, Annotation, Private Attorney General Doctrine-State Cases , 106 A.L.R.5th 523 (2003) (collecting cases). Although the private attorney general exception to the American rule was being embraced in lower federal courts, the Supreme Court put this development to a full stop in federal courts in Alyeska Pipeline , 421 U.S. at 254-69, 95 S. Ct. at 1620-27.
The private attorney general theory is not a wide-open mechanism whereby any successful plaintiff can obtain attorney fees. Instead, it is a limited exception to the generally applicable American rule. In the seminal case of Serrano , the California Supreme Court held that attorney fees on a private attorney general theory could be awarded if (1) the litigation benefited a large number of people, (2) private enforcement of the rights involved was required, and (3) the issues have sufficient social importance. 141 Cal.Rptr. 315, 569 P.2d at 1314. There are, of course, variations in the private attorney general doctrine from jurisdiction to jurisdiction. See William B. Rubenstein, On What a "Private Attorney General" Is-And Why It Matters , 57 Vand. L. Rev. 2129, 2142 (2004).
*717 I would generally adopt the three-pronged test articulated in Serrano for determining whether attorney fees could shift based on a private attorney general theory in cases involving a state constitutional tort. In particular, it seems clear that in cases involving alleged search and seizure violations under the state constitution, the second and third criteria are likely met.
The only question is whether a substantial number of persons would benefit from the litigation. A significant benefit does not require a tangible asset or concrete gain but may arise simply from the effectuation of a fundamental constitutional or statutory policy. Slayton v. Pomona Unified Sch. Dist. , 161 Cal.App.3d 538, 207 Cal. Rptr. 705, 714 (1984). On the other hand, an individual claim with little public benefit, such as that arising from a singular miscalculation of overtime benefit, is not sufficient. State v. Boykin , 112 Ariz. 109, 538 P.2d 383, 388 (1975) (en banc); see also City of Clarkston v. City of Clarkston Civil Serv. Comm'n-Fire , No. 15119-1-III, 1997 WL 282501, at *5-6 (Wash. Ct. App. May 29, 1997) (addressing reinstatement of police chief). As with the other issues, I would not engage in application of this test to the facts of this case. I would only hold that attorney fees may be awarded under the private attorney general theory described above. The majority opinion does not address the private attorney general question, and it thus remains an open issue.
VI. Conclusion.
I would answer the certified questions as follows: the municipality is not entitled to good-faith immunity, punitive damages may be available against a municipality upon a proper showing, and attorney fees may be available under the bad faith or private attorney general theories.

I agree with the majority to limit our answers to questions of law posed in the certified questions presented by the federal district court.